# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| LISA M. SWEENEY, individually, and as Co-Trustee of the Josephine S. Sweeney Living Trust, | ) ) ) ) | |
| Petitioner/Counterclaim Respondent, | ) ) ) | |
| v. | ) ) | C.A. No. 2022-0021-KSJM |
| MARK SWEENEY, individually, and as Co-Trustee of the Josephine S. Sweeney Living Trust, | ) ) ) ) | |
| Respondent/ Counterclaim Petitioner. | ) ) ) | |

## POST-TRIAL MEMORANDUM OPINION

Date Submitted: March 15, 2024
Date Decided: June 18, 2024

Mary Ann Plankinton, Lauren A. Nehra, GAWTHROP GREENWOOD PC, Wilmington, Delaware; *Counsel for Petitioner and Counterclaim Respondent Lisa M. Sweeney*.

Thomas A. Uebler, Jeremy J. Riley, Adam J. Waskie, Terisa A. Shoremount, MCCOLLOM D'EMILIO SMITH UEBLER LLC, Wilmington, Delaware; *Counsel for Respondent and Counterclaim Petitioner Mark C. Sweeney*.

**McCORMICK, C.**

This post-trial decision resolves the latest family dispute between Lisa M. Sweeney and Mark C. Sweeney, co-trustees of a trust established by their mother, the Josephine S. Sweeney Living Trust (the "Trust").[1] Josephine died in 2018. Among other things, she left the Trust a collection of guns, coins, and precious metals that she and her sister, Theresa, had inherited from their brother, Richard. Theresa died not long after Josephine. Before her death, Theresa changed her estate planning documents to expressly disinherit Lisa and a third sibling, Karin, and to appoint Mark as the sole trustee. Lisa and Karin did not take the news well. In prior litigation, Lisa claimed that Mark exercised undue influence over Theresa when she changed her estate planning documents.

Lisa's prior suit against Mark was dismissed and thus short-lived. That litigation, however, had negative effects on the siblings' co-trustee relationship. Over its course and after the prior litigation, Lisa's animosity toward Mark swelled, and she began refusing to perform her basic obligations as co-trustee. For example, she refused to write checks to reimburse Mark for expenses he covered for the Trust. Lisa's bad acts culminated in August 2020, when she broke into a property maintained by Mark to search for Trust assets. When she did not find what she was looking for, Lisa filed this lawsuit alleging that Mark breached his fiduciary duties by hiding or converting the precious metals. Mark counterclaimed. Both Lisa and Mark asked the court to remove the other as co-trustee.

---

[1] This decision refers to the members of the Sweeney family by their first name to distinguish them. The court intends no disrespect.

The facts presented at trial were dramatic. They featured: A disinheritance. A pre-meditated break-in. A ransacked home. Covert surveillance operations. A family-farm-turned-hemp operation. Accusations of matricide. A gun collection. And gold and silver hidden in the rafters. In contrast, the legal issues presented were drab. The court was asked to decide: Did either Lisa or Mark breach their fiduciary duties to the Trust, and, separately, should either be removed as co-trustee?

This post-trial decision enters judgment in favor of Mark, who proved that his sister's dragon sickness and related ill feelings toward him caused her to breach her fiduciary duties to the Trust. As a result, Lisa is removed as co-trustee and must pay damages to the Trust.

## I. FACTUAL BACKGROUND

The record comprises 289 joint trial exhibits, trial testimony from five fact witnesses, deposition testimony from five fact witnesses, and 17 stipulations of fact in the pre-trial order.[2] These are the facts as the court finds them after trial.

---

[2] This decision cites to: C.A. No. 2022-0021-KSJM docket entries (by docket ("Dkt.") number); the Pre-Trial Stipulation and Order ("PTO"), Dkt. 64; trial exhibits (by "JX" number); the trial transcript, Dkts. 68–69 ("Trial Tr."); and the deposition transcripts ("Dep. Tr.") of Lisa M. Sweeney (JX-225), Mark C. Sweeney (JX-226), Robert J. Schaefgen (JX-228), Karin A. Sweeney (JX-233), and Patrick J. Sweeney (JX-234). The transcripts of the witnesses' respective depositions and their trial testimony are cited using the witnesses' first names.

### A. The Josephine Trust

Josephine S. Sweeney died on January 31, 2018.[3] She was survived by her sister, Theresa A. Smith, and her three children, Mark, Lisa, and Karin. Josephine's brother, Richard A. Smith, died before her, on March 3, 2012.[4]

In 2017, Josephine executed a pour-over Last Will and Testament and Trust Agreement (the "Trust Agreement"),[5] governed by and administered under Delaware law.[6] The Trust Agreement provided that, upon Josephine's death, Mark and Lisa would be jointly appointed as trustees.[7]

At her death, Josephine's Trust held: real property located at 279 Vandyke Maryland Line Road, Townsend, Delaware 19734 (the "Townsend Property"); a Chevrolet Malibu; coins, guns, and precious metals that Josephine had inherited from Richard; and other tangible property.

The Trust Agreement provided instructions for the distribution of Josephine's tangible and real property.[8] As to the real property, it directed the trustees to sell "at the most opportune time as determined by my Trustee, to maximize, to the extent possible, the proceeds from the sale."[9]

---

[3] PTO ¶ 4.

[4] *Id.* ¶¶ 4, 6.

[5] *Id.* ¶ 7; JX-4 (Trust Agreement).

[6] Trust Agreement § 14.07(d).

[7] *Id.* § 3.03(a).

[8] *Id.* § 6.01

[9] *Id.* art. 7.

The Trust Agreement provided that "[t]he Common Trust will terminate when each of my then-living children has reached the age of 65 years."[10] Upon termination, the Trust Agreement directed the trustees to divide the Trust into separate shares for Josephine's then living descendants, per stirpes, and then hold and administer each such share in a further trust.[11] Lisa, Josephine's youngest child, turned 65 on December 31, 2023.[12] The Common Trust thus terminated, and the parties await this decision to identify who will handle dividing the Trust property among the living descendants.

## B. The Sibling Quarrel

At the outset of the Trust administration, Mark and Lisa agreed that Mark (who lived in Delaware) would collect the Trust's bills each month and send copies or pictures of the bills to Lisa (who lived in Virginia at the time). Lisa, who kept the Trust's checks,[13] would then write out, sign, and mail the checks to Mark to pay the bills.[14]

---

[10] *Id.* § 8.01(e).

[11] *Id.* § 8.03.

[12] PTO ¶ 12.

[13] Trial Tr. at 29:20–30:2 (Lisa); *id.* at 346:6–15 (Mark); *see, e.g.*, JX-10 (Mark sending copies of invoices to Lisa); JX-23 at 1 (same for various bills).

[14] Trial Tr. at 252:11–253:1 (Mark) (explaining Lisa's process for sending checks back to Mark).

4

At first, Mark and Lisa served as co-trustees of the Trust without significant conflict. As they agreed, Mark was the boots on the ground, and Lisa maintained the checkbook and wrote checks. Things changed after Theresa died on March 28, 2020.[15]

Years before her death, Theresa had planned to leave her tangible property to Mark, Lisa, and Karin, and name Mark and Lisa co-trustees. Prior to her death, however, Theresa modified the terms of her estate planning documents to name Mark the sole trustee and beneficiary of her tangible personal property.[16] Theresa's trust also held real property located at 1440 Paddock Road, Smyrna, Delaware (the "Paddock Road Property"),[17] which she directed would be sold and split equally between Theresa's then-living great-nieces and great-nephews, including Lisa's and Karin's children.[18]

Theresa did not leave anything to Lisa or Karin, which the sisters learned in April 2020.[19] Lisa did not take the news well.[20] Karin stated that she was "somewhat surprised."[21] At trial, however, Karin admitted that Theresa's decision could have

---

[15] PTO ¶ 4.

[16] JX-31 at 26, § 3.02(a) (appointing Mark solely). In Theresa's prior trust instrument dated October 4, 2017, Mark and Lisa were jointly appointed as co-trustees, and Theresa's tangible personal property was to be distributed to Mark, Lisa, and Karin. JX-6 at 22–23.

[17] PTO ¶ 15.

[18] *See* JX-31 at 25–27.

[19] JX-32.

[20] *Id.* (Lisa writing to Karin that she "couldn't believe" that Theresa "would do that . . .").

[21] JX-39 at 1 (Karin writing to Lisa "I'm somewhat surprised she was so small as to disinherit me . . . [I] took her to ALL her . . . doctor's [appointments]").

been the result of Karin accusing Theresa (to her face) of killing her own mother (Lisa's and Karin's grandmother) to take possession of the family farm.[22]

Lisa filed suit in this court to invalidate Theresa's will and trust agreement on September 21, 2020. She alleged that Theresa lacked capacity when she modified the trust agreement and that Mark exerted undue influence over Theresa prior to Theresa's death.[23] On July 27, 2021, Magistrate Molina issued a Draft Report recommending that the suit be dismissed.[24] Lisa took exceptions to the Draft Report, and Magistrate Molina issued a Final Report on November 30, 2021, again recommending dismissal.[25] Lisa did not take exceptions to the Final Report, which the court implemented on December 17, 2021.[26]

The litigation over Theresa's trust strained the siblings' relationship, which, among other things, made administering the Trust as co-trustees difficult. Lisa's actions became increasingly problematic as time wore on. For example, Lisa delayed

---

[22] *Id.* (email from Karin to Lisa stating "I did accuse [Theresa] of killing Grandmom for her farm"); *see also* Trial Tr. at 203:4–8 (Karin) ("I can understand why [Theresa] would disinherit me because I always thought she killed Grandmom, but I don't understand why she would disinherit Lisa, and I still don't understand why she would disinherit Lisa.").

[23] *Lisa. M. Sweeney v. Mark C. Sweeney*, C.A. No. 2020-0802-SEM [hereinafter "Invalidation Action"], Dkt. 1, Petition for Review of Proof of Will, to Invalidate Restatement of Trust, to Declare Rights under Trust, and for Related Equitable Relief.

[24] Invalidation Action, Dkt. 25.

[25] Invalidation Action, Dkt. 26, Petitioner Lisa M. Sweeny's Notice of Exceptions to the Magistrate's Draft Report of July 27, 2021 with Certificate of Service Attached; Dkt. 35, Magistrate's Final Report dated November 30, 2021.

[26] Invalidation Action, Dkt. 36.

or refused to reimburse Mark for Trust expenses, including car insurance, tax preparation, and property insurance.[27] For 15 months, Lisa refused to fill out a power of attorney form that Mark needed to retitle and sell Josephine's Chevy Malibu.[28] During that time, the car's tires "cracked up" and deteriorated.[29] Lisa refused to reimburse Mark when he replaced the tires.[30] Mark faced similar problems trying to get Lisa's cooperation to retrieve stocks held through Computershare that were escheated to Delaware's Office of Unclaimed Property.[31] Mark began asking for Lisa to fill out the relevant documents in March 2021.[32] She did not do so until early 2022.[33]

---

[27] *See, e.g.*, JX-204 lns. 107, 110, 134–36 ("Please find attached the bills for mom's car insurance for which I have not been reimbursed since November 2020. I also paid for the trust taxes see attached [receipt]."); JX-26 & JX-27 (car bills), JX-46 (letter detailing Lisa's delays), JX-66 & JX-67 (Mark showing unpaid car insurance bill), JX-90 (letter to Lisa from Mark identifying seven expenses, including car insurance, farm insurance, taxes, and tax preparation, dating back to November 2020, totaling $7,780.22 for which Mark paid but had not been reimbursed, despite his repeated requests).

[28] In August 2020, Mark took the Malibu to be inspected, but it failed due to an exhaust issue. JX-204 ln. 106. Mark fixed an exhaust issue, and the car passed inspection. JX-38. But the Delaware Department of Motor Vehicles (DMV) would not allow Mark to tag, register, or title the car without either both co-trustees being present, or the absent trustee (Lisa) executing the DMV power of attorney form. JX-38 (Mark noting that the DMV "wouldn't let [him] tag, register, or title the car without a power of attorney form signed by you in the presence of [a] notary").

[29] Mark Dep. Tr. at 51:17–24.

[30] JX-172 at 81 (Lisa telling Mark she "will not send a check for reimbursement for any[]more car expenses").

[31] *See* JX-58 at 1.

[32] JX-53.

[33] *See, e.g.*, JX-204 lns. 278–79.

Of all the assets left by Josephine, however, two provided by far the greatest sources of sibling strife: Richard's valuables (the coins, guns, and precious metals) and the Townsend Property.

## C. The Coins, Guns, And Precious Metals

The siblings dispute the quantities of Richard's valuables. Helpfully, Josephine and Theresa prepared a handwritten inventory on June 11, 2012, when administering Richard's estate (the "Inventory").[34]

The Inventory states, in relevant part:

- Coin Collection, $7,328.50 [the "Coin Collection"];

- Guns, 4 handguns, 1 shotgun, $1,622.00 [the "Gun Collection"];

- Precious Metals; Gold Eagles, 91 coins @ 1709.80 oz, $155,591.80; Silver E, 24 boxes @ 34.525 ea., $41,430.00 [the "Precious Metals"].[35]

Josephine and Theresa's notations as to the Precious Metals require some translation. There were 91 Gold Eagle coins.[36] Each weighed one ounce, and "1709,80 oz" means $1,709.80 per ounce, or $155,591.80 total. There were 24 boxes of "Silver E" or Silver Eagle coins valued "@ 34.525 oz." Each weighed one ounce, and the "34.525 oz" notation meant $34.525 per ounce.[37] The Silver Eagle coins were stored in green "Mint" boxes,[38] which held a maximum of 500 coins each.[39] Five hundred

---

[34] PTO ¶ 4.

[35] JX-1 (formatting altered).

[36] *Id.*

[37] *Id.*

[38] Trial Tr. at 232:15–16 (Mark).

[39] Trial Tr. at 241:2–6 (Mark); *id.* at 213:24–214:3 (Robert).

coins multiplied by 24 boxes equals 12,000. Twelve thousand multiplied by $34.525 per ounce equals $414,300. The Inventory ascribed a total value of "$41,430.00" to the Silver Eagles, but that is clearly wrong. Josephine was approximately 90 years old when she filled out the Inventory.[40] She misplaced the decimal. So, properly understood, the Inventory reflects that the Josephine and Theresa valued the Precious Metals at $569,891.80.

Mark helped Josephine and Theresa move Richard's valuables after his death in 2012.[41] From Josephine's death in 2018 until Theresa's death in March 2020, Richard's valuables were stored either in Josephine and Theresa's house or in Mark's basement.[42] Mark stored a portion of the Precious Metals—the Silver Eagles—in his home until 2015, when he moved the valuables to the Paddock Road Property.[43] Josephine and Theresa stored the remainder of the Precious Metals—the Gold Eagles—at the Townsend Property.[44] Patrick testified that he helped Josephine and Theresa move the Gold Eagles from the Townsend Property to the Paddock Road Property in 2015.[45]

---

[40] *See, e.g.*, *id.* at 17:5–9 (Lisa).

[41] *Id.* at 233:6–234:5 (Mark).

[42] *Id.* at 243:10–13 (Mark). After Theresa's death, Mark found the Coin Collection and Gun Collection in the basement of the Paddock Road Property. *Id.* at 243:10–13, 246:12–13 (Mark).

[43] *Id.* at 233:6–234:5 (Gold Eagles), 322:23–323:3 (Coin Collection), 324:19–24 (Gun Collection).

[44] *Id.* at 242:21–24 (Mark).

[45] *Id.* at 142:9–23, 144:1–8 (Patrick).

A month after filing suit to invalidate Theresa's trust agreement, in October 2020, Lisa's counsel fired off a letter to Mark asking him to confirm his understanding that Josephine inherited one-half of Richard's valuables listed on the Inventory.[46] Mark's counsel responded in a letter dated November 27, 2020, explaining that the Trust property included any tangible personal property that belonged to Josephine at the time of her death, and did not include any property that Josephine never received or otherwise disposed of prior to her death.[47] Mark's counsel further explained that Mark had—at that point—located two boxes that each contained 500 Silver Eagles, one shotgun, and two handguns that belonged to Josephine.[48]

What Mark had reported did not match the Inventory, which made Lisa suspicious. Eight months later, and two weeks after Magistrate Molina issued the Draft Report dismissing the prior litigation, Lisa's counsel wrote to Mark to request a meeting.[49] Lisa planned to be in Delaware between August 20 and 24, 2021, and asked that Mark allow her to inspect the Trust property during that time.[50] Mark could not meet then; he had planned a sailing trip from August through October or

---

[46] JX-42.

[47] JX-46.

[48] *Id.*

[49] JX-75.

[50] *Id.*

November.[51]  But he responded that he was willing to meet with Lisa when he returned in November.[52]

After years of causing delays in the Trust administration, Lisa was suddenly impatient.  She wanted to inspect the Trust property in August to "inventory" her "mother's estate" at the Paddock Road Property.[53]  She began making plans to break into the Paddock Road Property on August 13.  That day, she enlisted the help of Mark's son, Patrick, to retain a locksmith.[54]

Lisa broke into the Paddock Road Property on August 20, 2021.  She was joined by her spouse, her two minor children, Karin, and Karin's husband, Robert.[55]  They searched the house for two days but found none of Richard's valuables.[56]  They did

---

[51] JX-204 lns. 144 ("I will not be available at that time. My lawyers have my schedule through November.") & 163 ("I will be away from 8-19-21 back in either October or November."). Trial Tr. at 152:21–24 (Patrick) (stating Mark's trip was a sailing trip "down on his boat").

[52] JX-90.  Trial Tr. at 277:10–12 (Mark) (Mark stating he agreed "to meet in person with Lisa on November 29, 2021").

[53] Trial Tr. at 104:16–17 (Lisa); JX-198 at 22 (Lisa expressing she entered the Paddock Road Property because it was "necessary to search for and to attempt to protect [T]rust assets")

[54] On August 13, Lisa emailed Karin, "No response from mark about meeting when we in Delaware. Do you know a good locksmith. So i can set up an appointment. I would like to get in [F]riday [at] 5[:00 p.m.] then we have the weekend to sort through stuff."  JX-77.  On August 16, Lisa emailed Karin, "Patrick knows a locksmith" and that she needed Lisa's help; Theresa "was a ho[a]rder" and "It[']s going to be messy." JX-80.

[55] JX-198 at 24.  Robert testified that he felt "reluctance" to enter the Paddock Road Property because he believed their entrance was "not authorized." Trial Tr. 217:23–218:16 (Robert).

[56] JX-85 ("We got in. . . . No coins at all.").

11

take some pieces of tangible property, namely: Theresa's "comfort" blanket; "some tax paperwork"; a notebook;[57] Theresa's cell phone; an owl sculpture; and a business card for a precious metals depository.[58]

Meanwhile, concerned by texts and communications he had received from Lisa,[59] Mark cut his sailing trip short.[60] When Mark returned to Delaware, he found that someone had broken into the Paddock Road Property, changed the locks, and ransacked the house and garage.[61] After initially denying any involvement, Lisa ultimately admitted that she had broken into the house and changed the locks.[62] She denied ransacking the Paddock Road Property but testified that it was in a really bad state when she entered it.[63]

The siblings met on November 29, 2021, to allow Lisa to inspect the Trust property, address open issues previously raised by Mark (such as signing the power of attorney form to allow Mark to transfer the title of the Malibu), and discuss

---

[57] JX-198 at 24–25.

[58] Trial Tr. at 106:1–107:10 (Lisa); *id.* at 182:14–19 (Karin); *id.* at 209:23–210:5 (Robert); JX-94 at 3.

[59] In fact, Lisa sent Mark over 40 texts on August 16, 2021. JX-204. She demanded, among other things, that Mark meet with her. *Id.* When Mark explained that he would be traveling, Lisa stated: "I guess a surprise visit will be needed . . . [t]hen you can't hide from me[.]" *Id.*

[60] Trial Tr. at 279:2–8 (Mark) ("I figured I'm going to have to cut this short and come home[.]").

[61] Trial Tr. at 272:9–20 (Mark); *see also* JX-204.

[62] JX-198 at 22–23.

[63] Trial Tr. at 104:16–105:5 (Lisa) ("It looked like someone had tossed it, you know what I mean, someone had ransacked it."); *id.* at 44:11–21 (Lisa) ("It was just full of filth, papers were thrown everywhere. It was just filthy, and it was hot.").

responsibility for the Trust going forward.[64] Karin appeared unexpectedly at the meeting.[65] Mark showed Lisa, Karin, and Lisa's private investigator the two boxes of Silver Eagles and the three guns that he identified in his November 27, 2020 letter.[66] Lisa also signed the power of attorney form to allow retitling of the Malibu.[67]

Karin threatened to break into the Paddock Road Property again after the November 29, 2021 meeting.[68] Mark took this as an invitation to do a more thorough search of the Paddock Road Property for Richard's valuables.[69] This treasure hunt was successful. He found additional Silver Eagles hidden in the rafters. There is no explanation in the record for how they got into the rafters. In all events, Mark located them at some point between November 29, 2021 and December 3, 2021.[70] He moved them first to his house to remove insect debris and mud and then repackaged them into Mint boxes.[71] Mark also found Gold Eagles loose "up on the sill plates . . . in the basement."[72]

---

[64] JX-90.

[65] Trial Tr. at 277:20–278:1 (Mark)

[66] *Id*. at 50:17–24 (Lisa); *see also* JX-110.

[67] Trial Tr. at 101:7–9 (Lisa).

[68] *Id*. at 283:9–15 (Mark)

[69] *Id*. at 281:11–16 (Mark) ("I knew it would only be a matter of time before the different assets there would have been exposed and possibly removed."); *id.* at 283:14–15 (Mark) ("I knew at that point that 1440 was no longer a safe place to keep anything.").

[70] JX-117; Trial Tr. at 281:8–282:22 (Mark).

[71] *Id*. at 283:2–8 (Mark).

[72] *Id*. at 282:14–20 (Mark).

Lisa's threats made Mark concerned about the security of the assets.[73] Mark determined that he would deposit the Precious Metals at the International Depository Service ("IDS").[74] On December 15, 2021, Mark opened two IDS accounts—one for Josephine's Trust and the other for Theresa's trust. Between December 14 and December 20, 2021, he deposited the Precious Metals that he had located into the IDS accounts.[75]

Mark did not immediately tell Lisa that he had opened the IDS accounts because he was concerned that she would interfere with his efforts to deposit the Precious Metals.[76] But Lisa learned in real time of Mark's actions from her extensive surveillance operation. After the break-in, Lisa plotted with Patrick to spy on Mark, which included Lisa sending her private investigator to follow, photograph, and video Mark.[77] Also around this time, Patrick dressed himself in camouflage and went into the woods near Mark's house to take pictures.[78] At other points, Patrick entered Mark's house without Mark's knowledge or permission to search and take

---

[73] *Id.* at 283:10–13 (Mark) ("[M]y first priority was to get the silver out of the garage because it was I thought an easier target for people to get into, because at the time the windows were not boarded.").

[74] *Id.* at 283:2–285:4 (Mark).

[75] PTO ¶¶ 17–20.

[76] Mark Dep. Tr. at 128:20–129:1.

[77] Lisa tried to convince the private investigator to "follow [M]ark and call cops saying he [is] driving drunk and cops pull over and search vehicle," and Lisa asked Patrick if they can "call cops and say he [is] driving after stealing from estate." JX-118 at 2.

[78] JX-120.

14

photographs.[79] On December 16, the private investigator waited at IDS to get "proof" that Mark had made deposits.[80] On December 17, Patrick took pictures of Mark loading the Precious Metals into his car.[81]

On December 22, 2021, Mark sent his counsel copies of the IDS inventories and fee schedule with instructions to pass them along to Lisa.[82] Mark did this although he was unaware of the extent of his sisters' surveillance operation. Mark's counsel then informed Lisa's counsel of the deposits and sent her the inventories and fee schedule on January 12, 2022.[83] In the end, Mark found "more silver than [the Trust] ha[d] a record for" through his searches.[84]

Still, based on the Inventory, 16 Gold Eagles were missing as of January 2022. Mark found those on June 15, 2023, while cleaning out the Paddock Road Property. Given the state of the property, it is no surprise that locating small coins within it was difficult. Mark deposited the coins and informed Lisa's counsel. He then supplemented the trial record.[85]

---

[79] Trial Tr. at 27:15–28, 156:9–13 (Lisa); *see also* JX-96 at 2 (Lisa requesting Patrick to take a few pictures a day in Mark's house while Mark was away); JX-85 at 4.

[80] JX-127

[81] JX-198 at 11–12.

[82] JX-140; JX-132.

[83] JX-132.

[84] Trial Tr. at 328:19–329:2 (Mark)

[85] Dkt. 76. The court granted Mark's Motion to Supplement the Record at post-trial oral argument. Dkt. 87 at 49:24–50:1.

### D. The Family Farm

The drama surrounding the family farm in Townsend rivaled that over Richard's valuables. For years, Patrick has lived at the Townsend Property and, seasonally, operated a licensed CBD hemp farm on the property.[86] Patrick had agreed to pay $500 a month in rent for the dwelling and $300 for the acreage, but he stopped payments during the pandemic.[87] Mark informed Patrick, on September 18, 2021, that Patrick would need to resume rent payments.[88] Lisa told Patrick that he did not have to pay the rent.[89] And he did not pay rent. At trial, Lisa testified that Patrick had been "paying" "rent" into a bank account, but she had no knowledge of or access to the account.[90] Patrick testified at his deposition that he was depositing $500 a month, but he was placing it in an account titled in his own name.[91] At trial, Patrick admitted that he did not always do that.[92]

---

[86] Patrick Dep. Tr. at 18–19.

[87] Trial Tr. at 134:1–7 (Patrick); JX-76 at 2.

[88] JX-104 ("Mark emailing Lisa, "Patrick tells me that you excused his rent due to Covid-19. The supreme court struck down the rent and eviction moratorium two weeks ago[.] I told Patrick he needs to resume paying rent.").

[89] JX-100; *see also* Trial Tr. at 109:9–16 (Lisa) ("Q. But you told Patrick he does not need to pay rent for renting 279? A. The house is falling down. Q. So you told Patrick he does not have to pay rent, the rent at [the Townsend Property]? A. I don't think it's worth anything, to be honest with you. I think it's almost uninhabitable, to be honest with you.").

[90] Trial Tr. at 109:20–110:23 (Lisa); Lisa Dep. Tr. at 249:16–250:22.

[91] Patrick Dep. Tr. at 73:5–78:15.

[92] Trial Tr. at 164:7–12 (Patrick).

Lisa also thwarted Mark's trust-mandated efforts to sell the Townsend Property.[93] Mark communicated to Lisa in a December 23, 2022 letter that the Trust would "obtain maximum" value for the Townsend Property if it is logged, subdivided, and sold to third parties.[94] Mark even approached two logging companies to get estimates.[95] Mark and Lisa discussed the project, and Patrick had the loggers out to the farm.[96] But Lisa refused to sell the property. She also refused, without good reason, to agree to the appraiser that Mark had selected, and she proposed alternative appraisers with poor reviews.[97] She delayed communication with Mark on these issues, frustrating his ability to move forward with an orderly sale process.[98]

Lisa's motivation to stop the sale of the farm stemmed in part from her desire for her son to work on the farm and nephew to live there.[99] These are fine goals for a

---

[93] JX-33 at 3 ("[The Townsend Property] must be sold.").

[94] JX-218 at 3.

[95] Trial Tr. at 316:17–23 (Mark) ("I actually approached two companies that do logging, because the -- the lumber on that property has not been harvested in well over 75 years; so to get that harvested.").

[96] Id. at 373:18–21 (Mark).

[97] Id. at 378:4–22 (Mark) ("[T]he person that Lisa recommended, he got a complaint put against him by the same company because he [didn't] inform them that she was a trainee and he did not provide his license number on the appraisal. And he was required to do so if the people were dealing with apprentices or trainees.").

[98] Id. at 317:4–6, 379:16–23 (Mark) ("I gave her his information and told her I also researched him, and he had an A plus rating on the Better Business Bureau. And I asked her – I asked her to check out and see if she found any problem with this appraiser. And then I never heard from her.").

[99] JX-83 at 2 ("We are not going to sell the farm. My son Will wants to work the farm when he is older too."); JX-96 at 3–4 (Lisa texting Patrick "I'm working on mom's estate and that farm for u . . . love you like a son . . . I will get you that farm[.]).

mother and aunt. But they were contrary to Josephine's intent as reflected in the Trust Agreement and Lisa's duties as co-trustee.[100]

### E. This Litigation

Lisa filed this action on January 7, 2022,[101] before she received the January 12, 2022 letter from Mark's counsel reporting the inventory and fee schedules for the IDS deposits. She initially alleged, based on observations from her surveillance operations, that Mark had absconded with the Precious Metals. After receiving the January 12 communication concerning IDS, however, she amended her petition to claim that Mark breached his fiduciary duties by failing to notify Lisa that he had deposited the Precious Metals and failing to inform IDS that Lisa was co-trustee.[102] As amended, the complaint asserted claims against Mark for breach of fiduciary duty and conversion and asked the court to remove Mark as co-trustee.

---

[100] Patrick and Mark also clashed over the Townsend Property. On February 1, 2023, Patrick emailed Mark's counsel, claiming the Trust owed him $32,000 for repairs and replacement of items including soil pipe, water pipe, extorted rent, propane, refrigerator, dishwasher, and 14 hemp plants. JX-236. During the week of trial, Patrick filed a lawsuit against the Trust for the reimbursements he claimed he was owed. *See Patrick Sweeney v. Josephine Sweeney et al.*, C.A. No. JP9-23-000176, Dkt. 1 (Del. J.P. Mar. 8, 2023). Patrick testified about the action at trial. Trial Tr. at 139:17–140:16 (Patrick). That case was closed on August 1, 2023. On July 25, 2023, Patrick filed a second suit, this time adding Mark as a defendant. *See Patrick Sweeney v. Mark Sweeney et al.,* Del. JP, C.A. No. JP13-23-008684, Dkt. 1 (Del. J.P. July 25, 2023). That case was stayed on December 14, 2023, pending this decision. This decision does not resolve the question of whether Patrick owes back rent or has habitability claims against the Trust.

[101] Lisa also filed a Motion to Expedite and a Motion for Temporary Restraining Order with the complaint. Dkt. 1. Mark opposed those motions, and Lisa ultimately withdrew them. Dkt. 18.

[102] Dkt. 14.

Mark answered the petition and filed counterclaims on March 2, 2022.[103] Mark asserted counterclaims against Lisa for breach of fiduciary duty and to remove her as a co-trustee. Mark also requested a declaratory judgment that he is entitled to reimbursement of all costs and expenses that he has incurred in connection with the administration of the Trust and this litigation, and that Lisa is not entitled to reimbursement and should be surcharged for the costs of this litigation.

The case moved forward in fits and starts. Lisa moved to squash a subpoena on her private investigator, which the court denied.[104] Lisa's initial counsel then withdrew in August, and Lisa secured new counsel in September 2022.[105] The parties attempted mediation, which failed.[106] The court held trial on March 9 and 10, 2023.[107] The parties completed post-trial briefing on September 22, 2023,[108] and the court heard post-trial argument on March 15, 2024.[109]

## II. LEGAL ANALYSIS

Lisa claims that Mark breached his disclosure obligations to her and the Trust beneficiaries. Under Delaware law, a trustee must keep co-trustees "reasonably informed about the administration of the trust" so all co-trustees have the

---

[103] Dkt. 17.

[104] Dkt. 29.

[105] Dkt. 39.

[106] Dkt. 43.

[107] Dkt. 67.

[108] Dkt. 74 ("Lisa's Opening Br."); Dkt. 75 ("Mark's Answering Br."); Dkt. 78 ("Lisa's Reply Br.").

[109] Dkt. 86.

information "reasonably necessary . . . to perform their duties . . . ."[110]  Similarly, a trustee must respond to a beneficiary's request for information.[111]  Even without being asked, a trustee must inform beneficiaries of "essential facts" related to the trust.[112]

Lisa and Mark each advance claims for breach of fiduciary duties.  "A claim for breach of fiduciary duty requires proof of two elements: (1) that a fiduciary duty existed and (2) that the [fiduciary] breached that duty."[113]  "A party bringing a claim for fiduciary breach generally has the burden of proving each element, including damages, of each of his causes of action by a preponderance of the evidence.  Proof by a preponderance of the evidence means that something is more likely than not.  By implication, the preponderance of the evidence standard also means that if the evidence is in equipoise, the Plaintiff loses."[114]

Lisa and Mark each owed fiduciary duties to the Trust.  "Under default principles of Delaware law, a trustee owes fiduciary duties to a beneficiary."[115]  "At common law, the duties of a trustee to trust beneficiaries include loyalty, good faith,

---

[110] 12 *Del. C.* § 3317.

[111] *McNeil v. McNeil*, 798 A.2d 503, 510 (Del. 2002).

[112] *Id.*

[113] *Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010) (internal citations omitted).

[114] *In re Happy Child World, Inc.*, 2020 WL 5793156, at *10 (Del. Ch. Sept. 29, 2020) (cleaned up).

[115] *Tigani v. Tigani*, 2021 WL 1197576, at *13 (Del. Ch. Mar. 30, 2021), *aff'd*, 271 A.3d 741 (Del. 2022) (TABLE).

and due care."[116]  Trustees also owe "a duty to furnish information to a beneficiary upon reasonable request."[117]  The terms of a trust agreement may eliminate or restrict default fiduciary obligations.[118]  Here, the Trust Agreement limits a trustee's liability for actions taken in good faith.[119]  The upshot of this language is that Mark must prove that Lisa acted in bad faith in order to prevail on any claim for damages.[120]  The contractual language only applies to claims for damages; Mark's claims to remove Lisa as co-trustee are not so cabined.[121]

---

[116] *In re Nat'l Collegiate Student Loan Trs. Litig.*, 251 A.3d 116, 185 (Del. Ch. 2020) (citations and quotations omitted).

[117] *Tigani*, 2021 WL 1197576, at *15 (citations and quotation marks omitted).

[118] 12 *Del. C.* § 3303.

[119] Trust Agreement § 12.08 ("[A]ny individual . . . that serves as my Trustee will not incur any liability by reason of any error judgment, mistake of law, or action or inaction of any kind in connection with the administration of any trust created under this trust, unless my Trustee's decision is shown by clear and convincing evident to have been made in bad faith.").

[120] *See* Boger's The Law of Trusts and Trustees § 542, Exculpatory or immunity clauses—Required standard of care reduced by settlor (noting that exculpatory provisions from liability may relieve a trustee from damages*); Mennen v. Wilm. Tr. Co.,* 2015 WL 1914599, at *22 (Del. Ch. Apr. 24, 2015), *aff'd sub nom. Mennen v. Fiduciary Tr. Int'l of Del.,* 166 A.3d 102 (Del. 2017) (TABLE) ("[T]he mere fact that a trustee has the power under the trust agreement to engage in the challenged conduct does not preclude a reviewing court from holding the trustee liable if he acted in breach of his duties. When, however, a grant of powers is combined with an exculpatory provision, a trustee is effectively insulated from liability."); *id.* (noting that Delaware courts will "exculpate a trustee from liability for anything except willful misconduct[.]"); *Hardy v. Hardy*, 2014 WL 3736331, at *15 (Del. Ch. July 29, 2014) (holding that, when there is a bad faith exculpatory provision in a trust agreement, a party must prove intentional misconduct to create liability for *monetary damages*) (emphasis added).

[121] Trust Agreement § 3.03(d).

In the trust context, a trustee acts in bad faith where a trustee makes decisions motivated by "personal [or] imprudent" reasons.[122] This is similar to the standard employed under corporate law, where a plaintiff can show bad faith by, among other ways, proving that a fiduciary "intentionally acts with a purpose other than that of advancing the best interests of the corporation."[123] "There is some conduct that is 'so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith.'"[124]

## A. Mark Did Not Breach His Duties.

Lisa claims that Mark breached his duties in two ways: first, by failing to tell his co-trustee and beneficiaries about the Trust assets, and actively concealing their location and quantity; and, second, by misappropriating and converting the Trust assets.

### 1. Lisa Has Not Proven That Mark Breached His Disclosure Obligations.

According to Lisa, Mark knew the quantities of Richard's valuables all along, failed to mention them until November 27, 2020, and did not tell his sisters about his

---

[122] *Mennen,* 2015 WL 1914599, at *26; *see also Venhill Ltd. P'ship ex rel. Stallkamp,* 2008 WL 2270488, at *23 (Del. Ch. June 3, 2008) (finding bad faith in the trust context where a trustee "acted in bad faith by impoverishing the [Trust]" in order to support his "personal reasons unrelated to the [Trust's] own best interest"); *Triple H Fam. Ltd. P'rship v. Neal*, 2018 WL 3650242, at *18 (Del. Ch. July 31, 2018) (applying same standard in the LLC context (quoting *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993))).

[123] *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 67 (Del. 2006).

[124] *Mennen*, 2015 WL 1914599, at *23 (quoting *In re Novell, Inc. S'holder Litig.*, 2013 WL 322560 at *10 (Del. Ch. Jan. 3, 2013)).

subsequent discoveries of additional Precious Metals until January 12, 2023.[125] This, according to Lisa, constituted breaches of fiduciary duties.

Lisa did not prove that Mark's communications concerning the Precious Metals constituted a breach of fiduciary duties. The parties do not meaningfully dispute Mark's treatment of the Coin Collection.[126] The evidence at trial revealed that Mark kept Lisa informed concerning the volume and location of Precious Metals and Gun Collection as he discovered them.[127] Mark informed Lisa when he deposited the Precious Metals.[128] It is admittedly unclear why, before December 2021, Mark did not go search for the Precious Metals that he ultimately found in the rafters, how they got into the rafters, or how Mark knew to look there. But once Mark located them, he reported what he found. The mystery of the Precious Metals does not amount to a breach of fiduciary duties.

Also, there is nothing nefarious about the delay between when Mark found the additional Precious Metals (December 2021) and when his counsel disclosed them to

---

[125] Lisa's Opening Br. at 11.

[126] According to the Inventory, the Coin Collection is less valuable than Richard's other assets. JX-1. According to Mark, it "fits in Tupperware," and the siblings have had constructive discussions about appraising it. Trial Tr. at 321:16–322:5 (Mark).

[127] Trial Tr. at 301:22–24 (Mark) (confirming his December 2021 email to counsel about the IDS deposits); JX-46 (November 2020 email about Mark finding the first two boxes); JX-132 (January 2022 email about the November 2021 discoveries and December 2021 deposits).

[128] Dkt. 76, Ex. A (IDS statements as of July 1, 2023), Ex. B (email from Mark's counsel to Lisa's counsel).

Lisa (January 2022, after Lisa filed this suit).[129]  The delay was not significant; it no doubt took Mark's counsel a few weeks to digest the information and draft the communication.[130]

In the end, Mark was obligated to keep Lisa "reasonably informed about the administration of the trust," which he did.[131]  He was also obligated to "respond to a beneficiary's request for information" and inform the beneficiaries of the "essential facts," which he also did.[132]  Lisa has not proven that Mark breached his disclosure obligations.

### 2. Lisa Has Not Proven That Mark Breached His Fiduciary Duties.

To the extent that Lisa claims that Mark breached his fiduciary duties by failing to provide her or the Trust beneficiaries reports of inventories, that theory fails for the reasons stated above.  Lisa also appears to allege that Mark converted trust assets in breach of his fiduciary obligations.  That theory too fails.

---

[129] JX-132; JX-140; JX-141; JX-142; JX-143; JX-144; JX-145; JX-146; JX-147; JX-148; JX-149.

[130] JX-150 at 2 (Mark's counsel emailing Lisa's counsel on January 12, 2022: "Mark informed me that he was depositing the coins he found in the depository and, on December 22, he sent me the attached inventories and fee schedule that he received from the depository. I intended to share this information with you, but I was working on collecting other information (over the holidays) regarding updates involving the Josephine Sweeney Living Trust that I wanted to communicate to you in one comprehensive email, which I was in the process of drafting when I learned of the new lawsuit.").

[131] 12 *Del. C.* § 3317.

[132] *McNeil*, 798 A.2d at 510.

Lisa alleges that Richard left over 50 boxes of precious metals to Theresa and Josephine, meaning that there should have been more Trust assets than Mark disclosed.[133] She claims that Mark converted the remainder.

Lisa's conversion case runs contrary to the most reliable evidence presented at trial. Multiple trial witnesses testified about the Inventory of Robert's valuables prepared by Josephine and Theresa.[134] That Inventory reflects quantities of Richard's valuables. And those quantities neatly align with the Precious Metals deposited at IDS. The Inventory states that there were 91 Gold Eagles; Mark proved that he placed exactly that amount in IDS.[135] The Inventory states that there were 24 boxes of Silver Eagles; Mark proved that he placed more than that in IDS.[136] Nothing was stolen.

In support of a counternarrative, Lisa relied on testimony from Karin, Robert, and Patrick, each of whom had either helped Mark move the Silver Eagles or seen

---

[133] Lisa's Opening Br. at 16–17.

[134] Trial Tr. at 196:7–198:1 (Karin); *id.* at 211:19–212:21 (Robert); *id.* at 236:2–242:10 (Mark).

[135] *Compare* JX-1 (Inventory) at 1 ("Gold Eagles 91 Coins"), *with* Ex. A to Dkt. 76 (7/1/23 IDS Holdings Report) at 1–2 (stating that the Josephine Trust account held 46 Gold Eagles and the Theresa trust account held 45 Gold Eagles).

[136] *Compare* JX-1 (Inventory) at 1 ("Silver E 24 boxes"), *with* Trial Tr. at 241:2–6 (Mark) (testifying that each mint box held a maximum of roughly 500 Silver Eagles), *and* JX-200 (2/1/22 IDS Holdings Report) at 1–2 (stating that each of the Josephine Trust account and Theresa trust account held 6,563 Silver Eagles); *see also* Trial Tr. at 328:19–329:2 (Mark) (testifying that he found "more silver than [the Trust] ha[d] a record for").

25

the boxes in Mark's basement.[137]  Although they each had imaginative recollections of far more Precious Metals than identified in the Inventory, no one testified that they knew exactly how many Gold Eagles or Silver Eagles existed.

Karin took a guess at trial when asked if she was familiar with Richard's estate in 2012: "I'm going to say, 70 or so—probably 70 or more green boxes full of silver coins, and I think two or three boxes full of gold coins."[138]  Karin later testified that she "never saw the 70 boxes."[139]  Karin also testified that when they cleaned out Richard's house, she only found two green (Mint) boxes,[140] but added that she watched 10 or 11 of the boxes get loaded into a truck.[141]  Karin then testified that when Josephine and Theresa moved into the Paddock Road Property, there were "53 boxes, tops.  Someplace between 48 and 53."[142]  That was based on a discussion with Robert, who thought that he and Karin carried 24 boxes, "so we thought Patrick and

---

[137] Lisa's Opening Br. at 16–18 (citing Karin Dep. Tr. at 15:7–14 (testifying during her deposition that Richard had about "69 or 70 boxes of silver"); Karin Dep. Tr. at 37:16–38:23 (testifying about her recollection of helping Mark move the silver out of Richard's house); Robert Dep. Tr. at 30:5–34:9 (Karin's husband, Robert, estimating during his deposition that he helped Mark move "at least 50" boxes of silver to the Paddock Road Property in 2015); Patrick Dep. Tr. at 50:22–51:19 (Patrick testifying that he took a picture of the boxes of silver in his father's basement in 2019, stating his believe that the boxes "started to dwindle and [26 boxes] was about, I would say it was about half the original amount")).

[138] Trial Tr. at 171:9–14 (Karin).

[139] *Id*. at 189:17 (Karin).

[140] *Id*. at 174:23 (Karin).

[141] *Id*. at 173:6–9 (Karin).

[142] *Id*.at 178:6–10 (Karin).

Mark had probably carried at least 24 maybe more than that."[143]   Karin further testified that the boxes in the Paddock Road Property's basement took up about a pallet's worth of space and that "when you look up on the internet, a pallet is about 53 boxes, so we sort of thought that 53 boxes had actually made it from Mark's basement."[144]

Robert testified that he "believe[s] that there were the best end of probably about 69 boxes."[145] He believes that because he used information provided in a subpoena, "and based on the number of coins, we did the calculation based on 500 Silver Eagle coins in a box, and it came out to be 69."[146]  But he has "no other way of knowing the total number than what was indicated in the subpoena, the 34,500 or so."[147] When asked: "[B]ased on the information from the Internet and that you were told that there were 34,000 coins, you 'did the math' there must have been 69 green boxes?" Robert answered, "That is correct."[148]

Patrick helped move but never counted the boxes.[149]

---

[143] *Id*. at 179:16–19 (Karin).

[144] *Id*. at 179:22–180:2 (Karin).

[145] *Id*. at 206:21–22 (Robert).

[146] *Id*. at 206:23–207:4 (Robert).

[147] *Id*. at 214:16–20 (Robert).

[148] *Id*. at 214:21–215:1 (Robert).

[149] *Id*. at 154:2–11 (Patrick).

None of this testimony proves that there were more Precious Metals than listed on the Inventory. Lisa has not met her burden to show that Mark converted Trust assets or breached his fiduciary duties.

### B. Lisa Breached Her Duties.

Mark claims that Lisa breached her fiduciary duties by refusing to send Mark checks to pay Trust expenses, reimburse Mark for Trust costs, and return paperwork needed to title the Malibu.[150] Mark also claims that Lisa breached her fiduciary duties by using Patrick to break in to the Paddock Road Property, instructing Patrick to take pictures, and by allowing Patrick to live in the Townsend Property rent-free, among other things.[151]

Perhaps the most flagrant display of poor judgment came when Lisa broke into the Paddock Road Property in search of the Trust property and then changed the locks. Mark also proved that Lisa:

- intentionally failed to send Mark checks to pay Trust expenses and failed to reimburse him for out-of-pocket costs;

- intentionally failed to send Mark Trust paperwork;

- refused to permit the logging, subdividing, and selling of parcels of the Townsend Property; and

- frustrated the sale of the Townsend Property.

Mark further proved that Lisa was motivated by her animosity toward Mark and not by the best interests of the Trust or its beneficiaries. In text messages to

---

[150] Mark's Answering Br. at 61–62.

[151] *Id.* at 62.

Patrick, Lisa called Mark "a loser" who "ripped off both estates and you and my children."[152] Lisa expressed that Mark "always hated [her] lifestyle" and was "crazy" and hoped that he would "keel over."[153] She also wished that she "had a copy of his medical records to help declare him unqualified to be . . . executor."[154] Lisa also told Patrick that she would "fight to keep [the] farm" and that she wished Mark "would just disappear."[155]

Lisa's actions were "not driven by the interest" of the Trust, but rather by her own animosity toward Mark and perhaps finding evidence to bring a future lawsuit against him.[156] Her actions were "patently unreasonable, "bore no relation to the long-term security of the Trust," and are "inexplicable apart from" her animosity toward Mark.[157] Lisa breached her fiduciary duties as co-trustee.

**C. Lisa Is Removed As Co-Trustee And The Trust Is Entitled To Damages.**

As a remedy for Lisa's breaches, Mark asks that the court: remove Lisa as co-trustee; order her to pay damages for costs she imposed on the Trust; and order her to pay Mark's attorney's fees incurred in this litigation.

---

[152] JX-63 at 2.

[153] *Id.* at 2.

[154] *Id.* at 3.

[155] JX-65.

[156] *Mennen,* 2015 WL 1914599, at *26.

[157] *Id.*

### 1. Removal

The court has the discretion to remove a trustee.[158] The court may remove a trustee where there is "[u]nfitness, unwillingness or inability of the trustee to administer the trust properly; or . . . [h]ostility between the trustee and beneficiaries that threatens the efficient administration of the trust."[159] Trustee removal "is an extreme form of equitable relief that should be exercised sparingly."[160] Removal of a trustee is reserved for situations in which the trust property is "endangered by a lack of capacity, honesty or fidelity," and is not appropriate for "some mere negligent breach of duty, arising largely from an honest mistake."[161]

Removal is appropriate here. Trial revealed that, without question, Lisa and Mark cannot work together. The court has found that Lisa breached her duties and Mark did not. Lisa's continued involvement as co-trustee "threatens the efficient administration of the Trust."[162] Lisa is removed as co-trustee. Mark shall be the sole trustee of the Trust and administer the rest of the Trust without interference.

---

[158] *Tigani*, 2021 WL 1197576, at *24.

[159] 12 *Del. C.* § 3327(3); *Tigani*, 2021 WL 1197576, at *21.

[160] *Tigani*, 2021 WL 1197576, at *21 (internal quotations and citations omitted).

[161] *In re Catell's Est.*, 38 A.2d 466, 469–70 (Del. Ch. 1944).

[162] *See* 12 *Del. C.* §§ 3327(2), (3)(c).

### 2. Damages

"The remedies available to address a breach of trust are wide[-]ranging, but specifically may include an order '[c]ompelling the trustee to redress a breach of trust by paying money, restoring property, or other means.'"[163]

Mark asks the court to order Lisa to pay damages to the Trust for the losses she caused. Specifically, Mark asks that Lisa be ordered to pay to the Trust for: (i) the cost of car insurance paid on the Malibu from September 2020 to March 2022, which Mark estimates was around $2,532;[164] (ii) the cost of replacing the tires on the Malibu, which was $479.88;[165] (iii) the lost rent on the Townsend Property from September 2021 to trial, which was $11,500;[166] and (iv) any amounts that were necessary to defend the dismissed action brought by Patrick against the Trust, and any subsequent actions that Patrick may bring against the Trust and/or its trustees, which have been supported by Lisa, for which Mark supplies no damages figure or estimate.[167]

---

[163] *Mennen*, 2015 WL 1914599, at *35 (citing 12 *Del. C.* § 3581(b)(3)).

[164] Trial Tr. at 100:9–13 (Lisa) ("We paid car insurance of [$]442 quarterly for four years."). There are 18 months from September 2020 to March 2022, which is six quarters. Six quarters multiplied by $442 is $2,532.

[165] *Id.* at 20:1–5.

[166] JX-104 (Mark informing Lisa the COVID-19 rent moratorium ended and Patrick should start paying rent); Trial Tr. at 109:1–19 (Lisa) (confirming that Patrick should not have to pay rent because the Townsend Property is not "worth anything . . . it's almost uninhabitable").

[167] Mark's Answering Br. at 67.

Mark showed that Lisa caused the Trust to incur unnecessary expenses in connection with the first two categories concerning the Malibu's car insurance and tires in the amount of $3,011.88. Lisa took 15 months to return the correct forms to Mark to allow the car to be sold. Lisa intentionally caused the Trust these costs by her bad faith actions and is liable for those damages.

Lisa does not have to pay the Trust for the second two categories concerning Patrick's back rent and the Trust's expenses in connection with the JP Court suit. As to the rent, the JP Court will determine whether Patrick owes that money. Lisa did tell Patrick that he could stay in the house "rent free," despite Mark informing Patrick he should resume paying rent after the COVID-19 rent moratorium expired.[168] But Lisa did not have the unilateral authority as co-trustee to relieve Patrick of his rent obligations. For that reason, it will be difficult for Patrick to rely on any of Lisa's representations as a defense in that suit. Patrick represented at trial, however, that he has defenses based on the habitability of the property. The JP Court is well-suited to hear that matter. Lisa is not liable for the back rent that she attempted to forgive. As for the expenses incurred in connection with the JP Court, the best Mark offers to hold Lisa liable is to show that Patrick and Lisa share the same counsel and that Lisa's counsel asked Patrick about his JP suit at trial.[169] This is insufficient to show

---

[168] JX-100; *see also* Trial Tr. at 109:9–16 (Lisa) ("Q. But you told Patrick he does not need to pay rent for renting 279? A. The house is falling down.").

[169] *See* Mark's Answering Br. at 37; Trial Tr. at 139:17–140:16 (Patrick and Lisa's counsel discussing the JP suit).

that Lisa intentionally supported Patrick's suit in bad faith and to the detriment of the Trust.[170]

### 3. Attorney's Fees

"In a judicial proceeding involving a trust, the court, as justice and equity may require, may award costs and expenses, including reasonable attorney's fees, to any party, to be paid by another party or from the trust that is the subject of the controversy."[171] Mark can recover his legal expenses from the Trust, but the court declines to shift his fees to Lisa.

## III. CONCLUSION

To sum it up, Mark wins. Lisa is removed as trustee and must pay $3,011.88 in damages to the Trust, plus post-judgment interest.[172] The parties shall confer on a form of order implementing this decision.

---

[170] Mark also seeks reimbursement from the Trust. Specifically, Mark was never reimbursed for the cost of replacing the cost of the tires on the Malibu; $983 in insurance on the Townsend Property that Mark paid on June 26, 2023; $940 in taxes on the Townsend Property that Mark paid on September 6, 2023; and about $1,491 for the storage of the Precious Metals. As sole trustee, Mark has the power to cause the Trust to reimburse him for Trust expenses he paid out of pocket. He has asked the court to enter an order concerning those reimbursements, but that is unnecessary. He does not need judicial approval to reimburse himself.

[171] 12 *Del. C.* § 3584.

[172] *Summa Corp. v. TransWorld Airlines, Inc.*, 540 A.2d 403, 409 (Del. 1988) ("A successful plaintiff is entitled to interest on money damages as a matter of right from the date liability accrues."). Under Delaware law, where neither party submits evidence showing the appropriate rate of interest, the court typically awards 5% over the Federal Reserve discount rate compounded quarterly.